IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

**RICHARD CHARLES WIMETT**,

              Plaintiff,

    v.

**OFFICER SEAN SOTHERN, OFFICER
MARK FRIEDMAN, OFFICER KATIE
MANUS, OFFICER WADE GREAVES,
OFFICER GRANT SMITH, and CITY
OF PORTLAND**,

              Defendants.

No. 3:12-cv-01406-MO

OPINION AND ORDER

**MOSMAN, J.**,

       Plaintiff Richard Charles Wimett filed suit against Defendant City of Portland, as well as

Defendants Sean Sothern, Mark Friedman, Katie Manus, Wade Greaves, and Grant Smith, each

an officer of the Portland Police Bureau, asserting claims under 42 U.S.C. § 1983.  (3d Am.

Compl. [80] at 1.)  He alleges that each officer deprived him of the Fourth Amendment's

guarantee of freedom from unreasonable searches and seizures, and claims that Officer Sothern

in particular used excessive force during his arrest.  *Id.* at 20–27, 28–29.  He also accuses Officer

Sothern of malicious prosecution.  *Id.* at 27–28.  Defendants move [96] for summary judgment.

Because Mr. Wimett has raised a genuine dispute of material fact as to whether Officer Sothern

used reasonable force, I deny summary judgment on the excessive force claim, as against both

the officer and the City of Portland.  I grant the motion in all other respects.

## BACKGROUND

On August 7, 2010, Alex Talakoub[1] of Medallion Jewelers, located at 308 Southwest

Alder Street in Portland, called 911.  (Wimett Decl. [155-1] Ex. 4 at 19:2–5, ECF p.6; Ex. 17 at

2, ECF p.59.)[2]  He reported that the culprit in a prior robbery at a different, unspecified location

was currently in the store.  (Wimett Decl. [155-1] Ex. 4 at 19:7–20:2, ECF p.6.)  In response to

the dispatcher's questions, Mr. Talakoub described the suspect as a tall, slim, white man in his

forties, wearing pants and a pink jacket.  *Id.* at 20:5–22.

The dispatcher broadcast the following description over police radio at 12:14 pm:

> SUBJ THAT WAS INVOLVED IN A ROBBERY AT ANOTHER STORE
> YESTERDAY IS I/S NOW.  WM, 40S, SLIM, PINK JKT, PANTS.  COMP SED
> HE COULDNT TALK WITHOUT DRAWING ATTENTION[.]

(Rice Decl. [98-2] Ex. 3 at 1.)  A Portland police officer recalled that "a getaway car" was

parked nearby the previous day, and that the suspect at the time was described as "a white male

about 30 years, 5'8", about 230 pounds," who "was wearing a suit, unshaven and he had a wig

on."  (Wimett Decl [155-1] Ex. 4 at 21:22–22:4, 23:22–24:1, ECF p.7.)  The officer also clarified

that the crime was a theft, not a robbery, but that the stolen goods were of "high value."  *Id.* at

22:21–23.  This information was broadcast to other police officers in the area, including Officer

Sothern.  (Rice Decl. [98-2] Ex. 3 at 1.)

---

[1] The caller's name is spelled "Alex Calacook" in the 911 call transcript and "Alex Balakou" in the CAD printout.
(Wimett Decl. [155-1] Ex. 4 at 19:3, ECF p.6; Rice Decl. [98-2] Ex. 3 at 1.)
[2] Mr. Wimett's twenty-six exhibits were filed in the Court's ECF system together in a single PDF.  For convenience,
citations to the exhibits include both the page number within the exhibit and the page number within the PDF.

## I.    <u>Officer Sothern's Initial Encounter with Mr. Wimett</u>

Officer Sothern responded to the scene.  (Wimett Decl. [155-1] Ex. 2 at 1, ECF p.1.)  As he parked his police vehicle, he saw inside Medallion Jewelers a man whose "physical description and clothing matched the description broadcast by" the dispatcher.  *Id.*  This was Mr. Wimett.  *Id.*  Officer Sothern lost sight of Mr. Wimett as he crossed Southwest Alder Street, but spotted him again outside the store soon afterward, "walking intently."  *Id.*  Officer Sothern "stepped into [Mr. Wimett's] path" and asked whether he was in the store earlier.  *Id.*

According to Officer Sothern, Mr. Wimett looked from side to side and answered, "No." *Id.*  Mr. Wimett denied having identification on his person.  *Id.*  When Officer Sothern asked where his identification was, Mr. Wimett turned and walked "around [a] concrete stairwell," then grabbed a bicycle and sprinted away, attempting to mount it.  *Id.*

## II.    <u>Mr. Wimett's Arrest</u>

Officer Sothern lunged for Mr. Wimett's torso, but instead grabbed a large backpack he was wearing.  *Id.*; Sothern Decl. [99] ¶ 3.  Both men fell to the ground.  (Wimett Decl. [155-1] Ex. 2 at 1, ECF p.1.)  Officer Sothern recalls that the prone Mr. Wimett "swung one of his arms" and attempted to regain his footing.  *Id.*  Officer Sothern "took control" of one of Mr. Wimett's arms, and commanded him to "put [his] other arm out."  *Id.*  Mr. Wimett chose instead to conceal his other arm under his body.  *Id.*  As Officer Sothern attempted to roll Mr. Wimett from his side onto his stomach, Mr. Wimett swung his head toward the officer, striking "the inside of [Officer Sothern's] right arm" with his teeth.  *Id.*  To avoid being bitten, Officer Sothern "struck [Mr.] Wimett on the right side of his head with [Officer Sothern's] forearm and elbow."  *Id.*  The officer commanded Mr. Wimett repeatedly to extend his other arm, but Mr. Wimett refused.  *Id.* Eventually, Officer Sothern managed to roll Mr. Wimett onto his stomach.  *Id.*

Mr. Wimett persisted in tucking his left arm underneath his body, frustrating Officer Sothern's attempts to secure it. *Id.* Officer Sothern took hold of his TASER and yelled, "Put your other arm out and stop fighting or I will tase you." *Id.* When Mr. Wimett again failed to comply, Officer Sothern fired the TASER's probes into Mr. Wimett's "middle back" from "about 12 inches away." *Id.* After cycling current through the probes for the first time, he again ordered Mr. Wimett to extend his arm, without results. *Id.* at 1–2, ECF pp.1–2. Officer Sothern cycled the TASER again, after which Mr. Wimett attempted to stand. *Id.* at 2, ECF p.2. After a third cycle, Mr. Wimett ceased "pulling away or trying to get up." *Id.* Either accidentally or deliberately, Officer Sothern cycled the TASER a fourth time, and handcuffed Mr. Wimett as the device delivered current. *Id.*; Ex. 14 at 2, ECF p.50.

Mr. Wimett testified at deposition that he lost consciousness during the altercation. (Rice Decl. [98-1] Ex. 1 at 94:1–2, 6–12.) He remained unconscious throughout, except for a moment when he awoke only to have Officer Sothern "beat[ him] unconscious" again. *Id.* at 94:9–10. Accordingly, he disclaims any memory of what happened during his arrest. *Id.* at 94:14

### III.     Search of Mr. Wimett's Person and Effects

Officer Sothern and Officer Smith, who had arrived at the scene by this time, conducted a pat-down search of Mr. Wimett's clothing. (Wimett Decl. [155-1] Ex. 2 at 2, ECF p.2.) When Mr. Wimett refused to tell Officer Sothern his name, Officer Sothern asked where he could find Mr. Wimett's identification. *Id.* Mr. Wimett again did not respond. *Id.* Officer Sothern asked him whether his backpack contained any identification, and Mr. Wimett nodded. *Id.* Officer Sothern then asked whether he "could get [Mr. Wimett's] ID," and Mr. Wimett "nodded again." *Id.* The officer searched the backpack. *Id.* Rather than Mr. Wimett's identification, however, he found a card bearing the name of Mr. Wimett's parole officer. *Id.* Mr. Wimett acknowledged

that the parole officer's card belonged to him, and told Sergeant Friedman his name and date of birth.  *Id.*  Officer Manus continued the search of the backpack.  (Wimett Decl. [155-1] Ex. 17 at 1, ECF p.58.)

When additional officers arrived to assist, Officer Smith entered Medallion Jewelers and spoke with Mr. Talakoub.  *Id.* at 2, ECF p.59.  Mr. Talakoub told him that Mr. Wimett had left a backpack and a pair of shoes in the store when he left.  *Id.*  Officer Smith left the store with the backpack and shoes.  *Id.*  On hearing that Mr. Wimett still had not told Officer Sothern his name, Officer Smith searched the second backpack for identification.  *Id.*  Instead, he found nothing but clothing.  *Id.*

Medical staff removed the TASER probes from Mr. Wimett's back and directed that he be transferred to OHSU to be treated for potential trauma.  (Wimett Decl. [155-1] Ex. 2 at 2, ECF p.2.)  Officer Smith followed Mr. Wimett to OHSU.  *Id.* at 2–3, ECF pp.2–3.  Officer Sothern later relieved him.  *Id.* at 3, ECF p.3.

## IV.    <u>Prosecution and § 1983 Action</u>

The State of Oregon obtained an indictment against Mr. Wimett, alleging numerous crimes including resisting arrest, escape, and theft of various items found in one of his backpacks.  (Rice Decl. [98-3] Ex. 5 at 1–2; Wimett Decl. [155-1] Ex. 2 at 2, ECF p.2.)  As a result, a Multnomah County Hearings Officer ordered 120 days' incarceration as a parole sanction.  (Gatto Decl. [159] ¶¶ 5–6.)  Soon after his release, he was arrested and charged with robbery, burglary and other crimes in a second indictment.  *Id.* ¶¶ 7–10; Rice Decl. [98-4] Ex. 6 at 1–3.  The two indictments were consolidated, and the first indictment was dismissed in exchange for Mr. Wimett's agreement to plead guilty to two counts in the second.  (Rice Decl. Ex. 7 [98-5] at 1; [98-6] Ex. 8 at 2.)

Mr. Wimett filed suit in this Court on August 3, 2012, alleging claims against five officers of the Portland Police Bureau, Mayor Adams, the Bureau itself, Multnomah County, Mr. Talakoub, and several others.  (Compl. [2] at 1–2.)  I dismissed the complaint without prejudice, permitting Mr. Wimett to proceed only against the Portland Police Bureau and Officers Sothern, Friedman, Manus, and Greaves.  (Order [7] at 6.)  I then struck Mr. Wimett's first amended complaint [24] for failing to set out all of his allegations against all defendants.  (Order [26] at 1– 2.)  Later, I adopted Judge Hubel's recommendation that Mr. Wimett's second amended complaint be dismissed with leave to amend.  (F&R [54] at 12; Op. & Order [57] at 2.)  Mr. Wimett filed his Third Amended Complaint [80], the operative pleading at present, on December 6, 2013.  Defendants filed a motion for summary judgment on February 18, 2014, on the ground of qualified immunity.  (Mot. [96] at 1–2; Mem. in Supp. [97] at 16.)  Mr. Wimett submitted a response [153], and Defendants replied [158].  Mr. Wimett followed up with a surreply [166].

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court must view the evidence in the light most favorable to the nonmoving party, drawing in his favor all reasonable inferences from the facts.  *T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).

The moving party bears the initial burden of informing the court of the basis of its motion and providing evidence that demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If that burden is met, the nonmoving party must "present significant probative evidence tending to support its claim or defense."  *Intel Corp. v. Hartford Acc. & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991) (internal quotation omitted).

The nonmoving party fails to meet its burden if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986)).

## DISCUSSION

Mr. Wimett asserts eight claims in total. The first four allege that Officers Sothern, Manus, Smith, and Friedman seized his person and searched his backpacks without probable cause or other justification. (3d Am. Compl. [80] at 20–24.) In his fifth claim, Mr. Wimett alleges "assault and battery" against Officer Sothern under the Fourth Amendment. *Id.* at 24–26. His sixth claim alleges "false arrest and false imprisonment" against Officer Sothern, apparently based on an assertion that the officer lied to the grand jury. *Id.* at 26–27. The seventh claim accuses Officer Sothern of malicious prosecution. *Id.* at 27–28. Finally, in the eighth claim, Mr. Wimett alleges that all five officers conspired to deprive him of his constitutional rights. *Id.* at 28–29. Mr. Wimett does not level any of these eight claims at the City of Portland expressly, but I understand his complaint to allege that the City is liable on all claims.

A § 1983 claim has two elements: (1) a violation of a federal constitutional or statutory right that was (2) committed under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Anderson v. Warner*, 451 F.3d 1063, 1067 (9th Cir. 2006). "[A] municipality cannot be held liable under § 1983 on a *respondeat superior* theory," but may be held to account for deprivations resulting from local government policy or custom. *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690–91 (1978). Even absent a policy or custom, a municipality may be liable under § 1983 if a municipal officer with "final policymaking authority" (1) caused the deprivation personally, (2) ratified the constitutional violation of a subordinate, or (3) harbored

deliberate indifference to the unconstitutional consequences of a subordinate's conduct. *Christie v. Iopa*, 176 F.3d 1231, 1235, 1238–39, 1240 (9th Cir. 1999).

Government officials enjoy immunity from liability for damages in a § 1983 action unless "the official violated a statutory or constitutional right," and "the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). A district court may address either of these two elements of the qualified immunity defense before the other. *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). A right is clearly established if, at the time of the alleged wrongful conduct, the right's "'contours'" are "'sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Id.* at 2083 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Qualified immunity is available to municipal officials. *See Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1092 (9th Cir. 2013).

## I.  <u>Unreasonable Search and Seizure by Officer Sothern</u>

Mr. Wimett alleges that Officer Sothern unlawfully seized him on August 7, 2010. (3d Am. Compl. [80] at 20.) The seizure resulted when Officer Sothern stepped into Mr. Wimett's path as he attempted to cross the street. *Id.* at 20–21. In the context of a different claim, Mr. Wimett also accuses Officer Sothern of "falsely arrest[ing]" him. *Id.* at 26. As an arrest is a paradigmatic Fourth Amendment seizure, I analyze the initial stop and subsequent arrest together. Finally, Mr. Wimett alleges that Officer Sothern searched his backpack without consent or probable cause. *Id.* at 21.

### A.  *Initial Stop*

A police officer "can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be

afoot.'" *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).  An informant's tip alone may furnish sufficient information to justify a stop if the officer has independent reason to trust the informant's reliability, such as a history of providing useful information. *Adams v. Williams*, 407 U.S. 143, 146–47 (1972).  Further, even if the officer has never dealt with the informant before, a named informant's tip bears "substantial indicia of reliability" because of the risk of liability for submitting a false report.  *See United States v. Palos-Marquez*, 591 F.3d 1272, 1275–76 (9th Cir. 2010) (reasoning that lack of anonymity rendered an in-person tip more reliable than an anonymous tip would be).

An anonymous tip may also furnish the facts necessary for reasonable suspicion, as long as the officer substantially corroborates the tip's details through independent investigation. *Alabama v. White*, 496 U.S. 325, 330–31 (1990).  This is so even if some of the details of the tip ultimately prove incorrect.  *See id.* at 331 (reasoning that officers reasonably relied on a tip where the suspect emerged from the predicted building at the predicted time and entered the vehicle described, though the suspect's name and apartment number were not verified). However, an anonymous tip lacking sufficient detail to allow police "to test the informant's knowledge or credibility" through investigation will not sustain an investigatory stop.  *Florida v. J.L.*, 529 U.S. 266, 271 (2000).

Here, Mr. Talakoub's tip provided Officer Sothern with sufficient reliable information to justify his initial stop of Mr. Wimett.  Mr. Talakoub described the suspect as a tall, slim white man in his forties wearing pants and a pink jacket, and told the dispatcher that the man was currently in the his jewelry store.  (Wimett Decl. [155-1] Ex. 4 at 20:5–22, ECF p.6.)  He insisted that he recognized Mr. Wimett from a robbery that took place the previous day.  *Id.* at 19:7–20:3, 20:23–21:1.  The dispatcher broadcast Mr. Talakoub's description over police radio (absent the

adjective "tall"), saying that it belonged to a suspect "that was involved in a robbery at another store yesterday." (Rice Decl. [98-2] Ex. 3 at 1.) Officer Sothern confirmed these observations when he arrived on the scene: he saw a slim white man who appeared to be in his forties, was wearing the described clothing, and was in the store. These corroborated details demonstrate that the tip was sufficiently reliable to allow Officer Sothern to reasonably suspect that Mr. Wimett was involved in a theft. That Mr. Talakoub furnished the dispatcher with his name and telephone number, exposing himself to liability for submitting a false report, enhances the tip's reliability.

Mr. Wimett's counterargument is unavailing. He contends that Officer Sothern cannot reasonably have believed that he was the thief from the day before because the 911 caller's description and the description police obtained from the prior theft were contradictory. (Resp. [153] at 12–13.) The theft suspect was earlier described as a white man in his thirties who was wearing a suit and had a car. (Wimett Decl. [155-1] Ex. 4 at 23:22–25, 24:1–4, ECF p.7.) This description was broadcast over police radio shortly after the 911 caller's description. (Rice Decl. [98-2] Ex. 3 at 1.) Mr. Wimett, on the other hand, observes that he "was in casual clothing" and "was riding a bicycle." (Resp. [153] at 12.) Moreover, Mr. Wimett was "in his 40s" at the time. *Id.* Because Officer Sothern heard both descriptions over police radio, Mr. Wimett argues, he could not reasonably suspect Mr. Wimett of being the younger and better dressed suspect from the previous day. (Surreply [166] at 3–4.) To the contrary, that he and the previous day's thief wore different clothing and traveled on different sets of wheels does not require the conclusion that they were different people. Moreover, even if the discrepancies between the descriptions should have led Officer Sothern to conclude that Mr. Wimett and the man in the suit were not the same person, Mr. Talakoub's insistence that he recognized Mr. Wimett could reasonably have suggested to him that Mr. Wimett was involved in the theft in some way. Officer Sothern's

observations corroborated Mr. Talakoub's tip in sufficient detail to entitle him to rely on it in stopping Mr. Wimett for investigative purposes.[3]

Because undisputed evidence demonstrates that Officer Sothern reasonably relied on Mr. Talakoub's tip in stopping Mr. Wimett, he did not violate Mr. Wimett's Fourth Amendment rights in doing so. Officer Sothern is therefore entitled to qualified immunity in connection with the initial stop.

**B.    *Arrest***

The Fourth Amendment permits a police officer to arrest a suspect without a warrant where he "has probable cause to believe a person committed even a minor crime in his presence." *Virginia v. Moore*, 553 U.S. 164, 171 (2008). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). The officer's subjective belief "is irrelevant to the existence of probable cause." *Id.*

In Oregon, refusal to obey a peace officer's lawful command is a misdemeanor. Or. Rev. Stat. § 162.247(1)(b), (2). Defendants argue that Mr. Wimett's continued flight after Officer Sothern ordered him to stop amounted to a violation of this statute, entitling the officer to arrest him. (Mem. in Supp. [97] at 15.) Importantly, Mr. Wimett does not deny that Officer Sothern told him to stop, but claims only that he "does not remember." (Resp. [153] at 21.)

Absent such a denial, or any alternate account of what occurred between the initial stop and his flight to his bicycle, Mr. Wimett's counterarguments lack any merit. He asserts that he did not attempt to flee from Officer Sothern, but merely walked away until he rounded a

---

[3] It bears emphasizing that the relevant question is not whether Mr. Wimett was involved in the previous day's theft, but whether Officer Sothern reasonably suspected his involvement based on the facts known to him when he responded to the 911 call. *See United States v. Mariscal*, 285 F.3d 1127, 1131 (9th Cir. 2002) ("[A] mere mistake of fact will not render a stop illegal, if the objective facts known to the officer gave rise to a reasonable suspicion that criminal activity was afoot.").

stairwell.  (Resp. [153] at 15.)  Nonetheless, he then admits that he broke into a run for his

bicycle at this point.  *Id.*  He also asserts that "he made no furtive gestures before running to

jump onto the bike."  *Id.* at 16.  Be that as it may, "running to jump onto the bike" in order to

avoid a peace officer is a "furtive gesture" in itself.  As if that were not enough, surveillance

footage recorded from within Medallion Jewelers shows Mr. Wimett sprinting down the

sidewalk with handlebars in hand, a police officer following close behind him. [4]  (Rice Decl.

[112] Ex. 4 at timestamp 10:44–10:48.)[5]  In light of Mr. Wimett's admission and other evidence

that he attempted to flee from Officer Sothern, a reasonable factfinder would have to conclude

that Officer Sothern had probable cause to believe that Mr. Wimett committed the offense of

refusal to obey a peace officer's lawful command.

    The undisputed facts require the conclusion that Officer Sothern reasonably arrested Mr.

Wimett based on probable cause to believe that he refused to obey the officer's command to

stop.  Officer Sothern therefore is entitled to qualified immunity in connection with Mr.

Wimett's arrest.

### C.    *Backpack Search*

    The Supreme Court has developed two independent touchstones for what police actions

amount to a "search" under the Fourth Amendment.  First, police officers subject a person to a

"search" when they invade "an expectation of privacy that society is prepared to consider

reasonable."  *United States v. Jacobsen*, 466 U.S. 109, 113 (1984).  Second, all physical

intrusions by police into private "persons, houses, papers, or effects" by which police obtain

information amount to "searches."  *Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013) (citing

*United States v. Jones*, 132 S. Ct. 945, 950–51 & n.3 (2012)).  A person generally retains a

---

[4] Mr. Wimett does not dispute that he is the person depicted attempting to flee from the officer in the surveillance footage.
[5] The footage appears in the third of three .AVI files stored on a single DVD.

reasonable expectation of privacy in his closed containers, including a "closed backpack." *United States v. Young*, 573 F.3d 711, 721 (9th Cir. 2009). The parties have not presented any authority concerning whether a backpack is an "effect" subject to protection under *Jones* and *Jardines*'s property-based rationale. Before *Jones* and *Jardines*, however, courts consistently referred to backpacks and similar items as "effects" in the Fourth Amendment context. *See Young*, 573 F.3d at 721 (reasoning that a "backpack[ is] in the general class of effects in which the public at large has a reasonable expectation of privacy") (internal quotation omitted); *Bond v. United States*, 529 U.S. 334, 336 (2000) ("A traveler's personal luggage is clearly an 'effect' protected by the Amendment."). I conclude that a backpack is an "effect" for purposes of the property-based as well as the privacy-based streams of Fourth Amendment case law.

"The Fourth Amendment generally requires police to secure a warrant before conducting a search." *Maryland v. Dyson*, 527 U.S. 465, 466 (1999). Here, Defendants assert that Officer Sothern's search of Mr. Wimett's backpack was reasonable under two exceptions to the warrant requirement: that for searches incident to lawful arrest and searches conducted with consent. Because I conclude that the search was justified as incident to Mr. Wimett's arrest, I decline to address whether Mr. Wimett consented to it.

In order to prevent the suspect from obtaining a weapon or destroying evidence, police officers may search "the area within the arrestee's immediate control" during the course of a lawful arrest. *United States v. Turner*, 926 F.2d 883, 887 (9th Cir. 1991) (citing *Chimel v. California*, 395 U.S. 752, 763 (1969)). In the Ninth Circuit, courts first determine whether the area searched was within the arrestee's control at the time of the arrest. *Id.* at 888. If so, the search may be reasonable even if the arrestee could not access the area as the search occurs. *Id.* Second, courts ask whether "subsequent events made the search unreasonable." *Id.* Where the

suspect is moved only a short distance and the search takes place within minutes of the arrest, the search remains reasonable. *See id.* at 887–88 (finding a search of the arrestee's bedding and closet not unreasonable where the search occurred soon after the suspect was arrested in his bedroom and taken to an adjacent room).

Officer Sothern's search of Mr. Wimett's backpack was a permissible search incident to arrest. Mr. Wimett had access to the backpack when he was arrested, as he was wearing it on his back at the time. That Mr. Wimett was handcuffed during the search, then, does not necessarily render it unreasonable. Further, Mr. Wimett does not dispute that Officer Sothern conducted the search within minutes of Mr. Wimett's arrest as Mr. Wimett sat near him on the sidewalk. Events subsequent to the arrest therefore did not render the search unreasonable. Because Officer Sothern reasonably searched Mr. Wimett's backpack as an incident to his lawful arrest, no Fourth Amendment deprivation resulted, and Officer Sothern is entitled to qualified immunity in connection with the search.

## II.    Unreasonable Search by Officers Manus, Smith, and Friedman

Mr. Wimett alleges that Officers Manus, Smith, and Friedman each violated the Fourth Amendment by searching one or the other of his two backpacks. (3d Am. Compl. [80] at 21– 24.)

### A.    *Officer Manus*

Officer Manus's report indicates that she took over the initial backpack search for Officer Sothern while the latter officer consulted medical staff regarding Mr. Wimett. (Wimett Decl. [155-1] Ex. 17 at 1, ECF p.58.) As Officer Manus's search of Mr. Wimett's backpack was merely a continuation of Officer Sothern's search, it is justified as an incident to Mr. Wimett's

arrest for the same reasons.  Officer Manus is therefore entitled to qualified immunity in connection with the search.

**B.    *Officer Smith***

Defendants offer two justifications for Officer Smith's warrantless search of Mr. Wimett's other backpack.  They assert that Mr. Wimett consented to the search, and that Mr. Wimett abandoned his property and privacy interests in the second backpack.  Because the undisputed facts require the conclusion that Mr. Wimett abandoned his second backpack, I decline to address whether he consented to the search.

A person has no reasonable expectation of privacy in property that he has abandoned. *United States v. Nordling*, 804 F.2d 1466, 1469 (9th Cir. 1986).  As is often the case in the Fourth Amendment context, whether a person relinquished his expectation of privacy in his property is to be determined according to the totality of the circumstances.  *Id.*  The Ninth Circuit has identified "two important factors": "denial of ownership and physical relinquishment of the property."  *Id.*  A verbal disclaimer of ownership is alone sufficient to relinquish an expectation of privacy.  *See United States v. Decoud*, 456 F.3d 996, 1007–08 (9th Cir. 2006) (holding that the suspect abandoned the contents of his briefcase by disclaiming ownership).  Conduct may also suffice on its own to show abandonment, if physical relinquishment is not accompanied by evidence of intent to maintain control over the property.  *See United States v. Mendia*, 731 F.2d 1412, 1414 (9th Cir. 1984) (finding that the suspect abandoned his heroin by handing it to a third person and making no effort to follow as the person drove away).  Of course, one who abandons his property necessarily relinquishes any possessory interest in the property as well.  *See, e.g.*, *Eads v. Brazelton*, 22 Ark. 499, 509 (1861) (stating that abandonment results when the property's "possession is voluntarily forsaken by the owner").

Undisputed evidence here demonstrates that Mr. Wimett left his second backpack behind in Medallion Jewelers with no intent to assert control over it in the future.  Surveillance footage recorded within the store shows Mr. Wimett leaving a backpack behind as he walks out of the jewelry store.  (Rice Decl. [112] Ex. 4 at timestamp 10:05–10:13.)[6]  Less than a minute later, the same footage shows Mr. Wimett attempting to flee the scene on his bicycle.  *Id.* at 10:44–10:48.  These facts leave no room for a genuine dispute over whether Mr. Wimett abandoned his second backpack within the jewelry store before Officer Smith searched it.

Because Mr. Wimett abandoned his backpack, Officer Smith invaded no constitutionally protected interest when he searched it.  Officer Smith is entitled to qualified immunity.

### C.    *Officer Friedman*

Mr. Wimett admitted during his deposition that Officer Friedman did not "touch [him] in any way."  (Rice Decl. [98-1] at 92:20–21.)  He also did not observe Officer Friedman searching either backpack.  *Id.* at 92:23–24.  The parties have directed me to no other evidence in the record to suggest that Officer Friedman participated in searching Mr. Wimett's effects.  Accordingly, Officer Friedman is entitled to qualified immunity.

## III.    Use of Excessive Force by Officer Sothern

Mr. Wimett alleges that Officer Sothern assaulted and battered him in three ways: by pulling him to the ground as he attempted to mount his bicycle, causing him to "hit[] his head on the payment [and] lose consciousness"; hitting him "about the head and neck" as he lay on the ground; and discharging a TASER into his prone and helpless form several times, at least in part after he was secured in handcuffs.  (3d Am. Compl. [80] at 25.)  He alleges that this conduct amounted to excessive force, depriving him of his Fourth Amendment right to freedom from

---

[6] Out of three .AVI files on the DVD, the cited footage appears in the third.

unreasonable seizures. *Id.* at 24–25. I will consider each of Officer Sothern's three alleged uses of force in turn.

An arrestee's claim that a police officer used excessive force is "analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989). To determine whether the force the officer applied exceeded that reasonably necessary "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. The potential threat to officers and others is "[t]he most important factor." *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (internal quotation omitted). These factors are considered "from the perspective of a reasonable officer on the scene." *Graham*, 490 U.S. at 396. "Because the excessive force inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, . . . summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005).

### A.    *Tackle*

"'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). Courts must bear in mind that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

Officer Sothern reasonably grabbed Mr. Wimett's backpack and tackled him from his bicycle in order to prevent him from fleeing.  At the time, Officer Sothern had probable cause to believe that Mr. Wimett had committed the crime of disobeying a police officer and reason to suspect that Mr. Wimett was involved in a high-value theft.  Mr. Wimett admits that he attempted to flee the scene by bicycle, and surveillance footage shows him attempting to mount a bicycle with a police officer at his heels.  (Resp. [153] at 15–16; Rice Decl. [98-4] Ex. 4 at 10:44–10:48.)  Use of some force was justified in order to thwart Mr. Wimett's undisputed escape attempt, both so that Officer Sothern could arrest him and to enable further investigation of an apparently serious theft.

Mr. Wimett argues that Officer Sothern's backpack tackle was excessive because the officer could have prevented his escape more gently, perhaps by grabbing and holding him. (Resp. [153] at 24.)  To credit this argument would be to scrutinize the officer's decisionmaking process more finely than the law permits.  Mr. Wimett's admitted attempt to pedal away from the store left Officer Sothern little time to consider his options.  No reasonable jury could conclude that grabbing Mr. Wimett and taking him to the ground was an unreasonable choice in those circumstances.

Because Officer Sothern's backpack tackle was a reasonable response to the undisputed circumstances, he is entitled to qualified immunity.

**B.**     ***Blow to the Head***

Once Officer Sothern recalls that, once he had Mr. Wimett on the ground, Mr. Wimett "swung one of his arms at [the officer] and tried to get up."  (Sothern Decl. [99] ¶ 4.)  As Officer Sothern brought one of Mr. Wimett's arms under control, he recorded in his police report, Mr. Wimett "thrust his head toward [Officer Sothern's] right forearm" with his mouth open such that

"his teeth [struck] the inside of [Officer Sothern's] right arm."  (Wimett Decl. [155-1] Ex. 2 at 1, ECF p.1.)  Officer Sothern then "struck [Mr.] Wimett on the right side of his head with [Officer Sothern's] forearm and elbow."  *Id.*  Mr. Wimett responds with a blanket denial that he resisted arrest in any way after Officer Sothern tackled him.  (Resp. [153] at 34.)  This includes an express denial that he tried to bite Officer Sothern.  *Id.* at 26.  He asserts instead that he was unconscious and therefore "unresponsive and still" through most of the arrest, except for a brief moment of wakefulness before Officer Sothern beat him unconscious again.  *Id.* at 34.; Rice Decl. [98-1] Ex. 1 at 94:6–19.

Mr. Wimett has raised a genuine dispute of material fact as to whether Officer Sothern's blow to his head was a reasonable use of force.  If his assertion that he was not resisting but merely regaining consciousness when Officer Sothern struck him were credited, as it must be at summary judgment, then Officer Sothern's of force against Mr. Wimett was not reasonable.  Mr. Wimett therefore has produced sufficient evidence to support an inference that Officer Sothern's blow to his head deprived him of his Fourth Amendment right not to be seized through use of excessive force.

The right of which Mr. Wimett contends he was deprived was clearly established as of his arrest.  Some police conduct so obviously violates a person's constitutional rights that "no federal case directly on point" is necessary to put a reasonable officer on notice of its unconstitutional nature.  *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1062 (9th Cir. 2003).  Use of force against a subdued or compliant suspect is an example.  *See id.* (finding that kneeling on a "compliant" suspect's back and neck even after he complains of lack of air is obviously excessive force); *LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 961 (9th Cir. 2000) (finding that use of pepper spray after "an arrestee surrenders and is rendered helpless" is

obviously excessive force).  Any reasonable officer would have understood that striking a prone

and unconscious suspect in the head without any provocation amounts to excessive force.

Officer Sothern therefore is not entitled to qualified immunity.

    **C.**    ***Multiple TASER Discharges***

    Officer Sothern used a TASER X26 on Mr. Wimett.  (Wimett Decl. [155-1] Ex. 3 at 1,

ECF p.5.)  In *Bryan v. MacPherson*, the Ninth Circuit explored just how much physical

discomfort and pain this device can cause.  The X26 fires two probes into the subject's muscles,

delivering current carrying 1200 volts of electric potential.  630 F.3d at 824.  The result is instant

paralysis and "excruciating pain." *Id.*  The subject's loss of control over his body also creates a

risk of physical injury from falls. *See id.* (noting that plaintiff suffered shattered teeth and facial

abrasions from an uncontrolled fall due to a TASER discharge).  Because of "[t]he physiological

effects, the high levels of pain, and [the] foreseeable risk of physical injury," the court held that

the TASER X26, "when used in dart-mode," is "an intermediate, significant level of force that

must be justified by the governmental interest involved." *Id.* at 825–26.

    Cases in which the Ninth Circuit has upheld use of a TASER as reasonable have in

common the subject's refusal to comply with repeated police commands and conduct posing a

danger to police officers or others.  In *Marquez v. City of Phoenix*, 693 F.3d 1167 (9th Cir.

2012), upon responding to a report that a man was conducting an exorcism on a three-year-old

girl, officers found the suspect lying on a bed with a motionless child "in a choke-hold." *Id.* at

1170–71.  One of the officers discharged a TASER's probes at the man after he refused to

release the child, and cycled current through the probes twice. *Id.* at 1171.  Perhaps because the

officer was too close to allow adequate spacing between the probes, the TASER did not subdue

the suspect, who began to kick the officer in the thighs and groin. *Id.*  The officer attempted

several more times to subdue the suspect using the TASER's "drive-stun mode."[7]  *Id.*  The

suspect died soon afterward of cardiac arrest.  *Id.*  The Ninth Circuit held that the use of the

TASER was reasonable because of the suspect's refusal to comply, the danger he posed to the

officers and others, and the severity of the suspected crime.  *Id.* at 1175–76.

        The Ninth Circuit endorsed use of a TASER against a similarly obstinate suspect accused

of a relatively minor crime in *Lindsay v. Kiernan*, 378 F. App'x 606 (9th Cir. 2010).  Officers

responded to a gas station clerk's complaint that a belligerent, intoxicated man insisted on

buying alcohol and refused to leave the premises.  *Id.* at 607.  The man was outside the store

when officers arrived, but attempted to enter again despite their commands to the contrary.  *Id.*

When the officers attempted to restrain the man physically, he "barreled through" them.  *Id.*

After issuing a warning, an officer deployed TASER probes, causing the man to drop to the

ground.  *Id.*  The man refused the officer's commands to remain on the ground and offer his

hands for cuffing, and the officer cycled current through the probes a second time.  *Id.*  The

Ninth Circuit held that the man's physical belligerence and repeated refusal to comply with the

officers' commands justified use of the TASER despite the relatively minor character of his

offenses.  *Id.* at 608–09.

        A recent case in which the Ninth Circuit found the use of a TASER in dart mode

excessive also shares the subject's failure to obey the arresting officers, but lacks the element of

danger present in *Marquez* and *Lindsay*.  In *Bryan*, the court found that officers unreasonably

deployed TASER probes where the unarmed, stationary subject posed no apparent threat to the

officers or anyone else.  630 F.3d at 826–27, 832.  The court noted that the subject refused the

officers' command to remain in his car, but reasoned that this resistance of the officers' authority

---

[7] In "drive-stun mode," the officer presses two electrodes on the front of the device directly into the suspect's skin. *Mattos v. Agarano*, 661 F.3d 433, 443 (9th Cir. 2011).

was too "passive" to justify use of the TASER. *Id.* at 830. In a similar case concerning use of a TASER in drive-stun mode, the court found the officers' use of force unreasonable where the subject's resistance amounted to no more than clutching the steering wheel and refusing to leave her car. *Mattos v. Agarano*, 661 F.3d 433, 444–45 (9th Cir. 2011).

Officer Sothern recalls that, after he struck Mr. Wimett in the head, Mr. Wimett continued to refuse to present his unsecured arm for handcuffing. (Sothern Decl. [99] ¶ 4.) Officer Sothern warned Mr. Wimett that he would use his TASER if Mr. Wimett continued to resist. (Wimett Decl. [155-1] Ex. 2 at 1, ECF p.1.) Mr. Wimett continued to conceal his left arm under his body, prompting Officer Sothern to deploy the TASER's probes "at close range." *Id.* "After the first cycle," he commanded Mr. Wimett to present his arm again. *Id.* When Mr. Wimett failed to comply once more, Officer Sothern cycled current through the probes a second time. *Id.* at 1–2, ECF pp.1–2. After the second cycle, Mr. Wimett attempted to stand again. *Id.* at 2, ECF p.2. Finally, after the third cycle, though "noncompliant," Mr. Wimett was no longer "pulling away or trying to get up." *Id.* Officer Sothern decided to take the opportunity to place Mr. Wimett in handcuffs.

Defendants' accounts of Mr. Wimett's arrest diverge at this point. In his declaration, Officer Sothern said that he secured Mr. Wimett in handcuffs "after the third cycle," with no mention of subsequent cycles. (Sothern Decl. [99] at ¶ 4.) In his police report, he recalls that he dropped the TASER after the third cycle and heard sounds indicating that "it was still cycling." (Wimett Decl. [155-1] Ex. 2 at 2, ECF p.2.) This would suggest that a fourth cycle was underway when Officer Sothern handcuffed Mr. Wimett. Finally, in an After Action Report concerning Officer Sothern's use of force, Sergeant Friedman recalls that Officer Sothern deliberately "cycled the [TASER] a fourth time" and then "set the TASER on the ground."

(Wimett Decl. [155-1] Ex. 14 at 2, ECF p.50.)  The use log for the device itself confirms that it was cycled four times on August 7, 2010.  (Wimett Decl. [155-1] Ex. 3 at 1, ECF p.5.)[8]

For his part, Mr. Wimett recalls no more than that he was unconscious throughout the encounter, except when he awoke for a brief moment before Officer Sothern beat him unconscious again.  (Rice Decl. [98-1] Ex. 1 at 94:6–19.)  Defendants argue that Mr. Wimett's failure to present an alternate account of the altercation leaves Officer Sothern's recollection undisputed.  (Mem. in Supp. [97] at 18.)  I reject this argument.  To the contrary, Mr. Wimett's testimony that he lost consciousness through most of the arrest is inconsistent with Officer Sothern's statements that he resisted the officer's attempts to secure him in handcuffs.  Because it is plainly unreasonable to channel more than one thousand volts of electricity multiple times through the body of an unconscious person, this testimony alone is sufficient to defeat summary judgment on Mr. Wimett's excessive force claim.

Mr. Wimett also points to evidence suggesting that he had already been secured in handcuffs when Officer Sothern first used the TASER.  (Surreply [166] at 6.)  A Computer Aided Dispatch ("CAD") printout indicates that Officer Sothern took Mr. Wimett into custody at 12:21:30.  (Rice Decl. [98-2] Ex. 3 at 1.)  The TASER log recites that the device was first discharged at 12:23:01, over a minute later.  (Wimett Decl. [155-1] Ex. 3 at 1, ECF p.5.)  According to Mr. Wimett, the City's own records show that he was in custody when Officer Sothern first deployed the TASER.  (Surreply [166] at 6.)  The discrepancy may well be due to poor synchronization between the TASER's internal clock and the CAD system, but read in the light most favorable to Mr. Wimett, the records permit the inference he invites.

_____

[8] The log indicates four five-second cycles within a minute of each other at 12:23 PM on August 7, as well as a single one-second cycle at 7:02 AM.  The earlier cycle could not have played a role in the events underlying this action, as Officer Sothern did not respond to the 911 call until approximately 12:21 pm.  (*See* Rice Decl. [98-2] Ex. 3 at 1 (indicating that Officer Sothern reported that he arrived on scene at 12:21:08).)

Mr. Wimett's testimony that he was unconscious throughout each TASER cycle is alone sufficient to raise a genuine dispute of material fact as to whether Officer Sothern's use of the TASER amounted to unconstitutionally excessive force.  Viewed in the light most favorable to him, the discrepancy he observes between the CAD printout and the TASER's use log further supports an inference that he was subdued and helpless when Officer Sothern first deployed the TASER's probes.  Moreover, his right not to suffer multiple TASER cycles while unconscious was clearly established.  Any reasonable officer would understand that using a TASER in dart mode to cycle current through an unconscious person multiple times is excessive. *Bryan* and *Mattos* further support this conclusion because, as in these cases, an unconscious suspect poses no danger to the arresting officer or others.

## IV.    <u>False Arrest and False Imprisonment by Officer Sothern</u>

In his sixth claim, Mr. Wimett repeats his allegations that Officer Sothern "unreasonably and unlawfully seized" him.  (3d Am. Compl. [80] at 26.)  As explained above at Part I.B, Officer Sothern is entitled to qualified immunity on any claim that Mr. Wimett's arrest was not justified by probable cause.  Mr. Wimett goes on to allege that Officer Sothern lied to the grand jury "in order to get an indictment," causing Mr. Wimett to be jailed. *Id.*

Mr. Wimett has presented no evidence to suggest that Officer Sothern testified in front of a grand jury, much less that he lied.  Instead, he merely asserts that Officer Sothern lied in his reports and declaration, for example by "embellish[ing] his injuries," without pointing out any specific defect in either document that would suggest dishonesty.  (Resp. [153] at 37.)  Because Mr. Wimett has not raised a genuine dispute of material fact, I grant summary judgment as to this claim.

V.     **Malicious Prosecution**

The factual allegations in Mr. Wimett's seventh claim duplicate those in his sixth.  (3d Am. Compl. [80] at 27–28.)  He asserts that Officer Sothern's alleged misrepresentations to the grand jury and in his police reports indicate that the officer prosecuted him maliciously and without probable cause.  *Id.*

To prevail on a claim of malicious prosecution under § 1983, a plaintiff must prove not only that the defendant "prosecuted [him] with malice and without probable cause," but also that the defendant "did so for the purpose of denying [him] equal protection or another specific constitutional right."  *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189 (9th Cir. 1995).  The law imposes this additional requirement because "no substantive due process right exists under the Fourteenth Amendment to be free from prosecution without probable cause."  *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1069 (9th Cir. 2004) (citing *Albright v. Oliver*, 510 U.S. 266, 268, 271; *id.* at 275 (Scalia, J., concurring); *id.* at 277 (Ginsburg, J., concurring); *id.* at 282–83 (Kennedy, J., concurring in the judgment); *id.* at 291 (Souter, J., concurring in the judgment)).

Here, Mr. Wimett has neither alleged nor presented evidence that Officer Sothern intended to deprive him of any constitutional right aside from his right under the Fourth Amendment to be free of unreasonable searches and seizures.  (3d Am. Compl. [80] at 27–28.)  I grant summary judgment on his § 1983 malicious prosecution claim.

VI.    *Monell Liability*

As noted above, a municipality may be liable under § 1983 if a municipal officer with "final policymaking authority" ratified a subordinate's unconstitutional conduct.  *Christie*, 176 F.3d at 1238–39.  Whether an officer has this authority "is a question for the court to decide based on state law."  *Id.* at 1235.  An inferior officer's conduct is attributable to the municipality

if an authorized policymaker delegated the requisite policymaking authority to her.  *Id.* at 1236

(citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124 (1988)).  In determining whether an

officer enjoys delegated policymaking authority, "courts consider whether the official's

discretionary decision is 'constrained by policies not of that official's making' and whether the

official's decision is 'subject to review by the municipality's authorized policymakers.'"  *Id.* at

1236–37 (quoting *Praprotnik*, 485 U.S. at 127).

     Ratification requires evidence that the final policymaker knew of the subordinate's

alleged constitutional violation and affirmatively approved it.  *Id.* at 1239.  If an officer with

final policymaking authority approves "a subordinate's decision and the basis for it," that

ratification is "chargeable to the municipality."  *Praprotnik*, 485 U.S. at 127.

     Defendants assert that Mr. Wimett has presented no admissible evidence to suggest that

any constitutional deprivation he suffered resulted from a policy or custom of the City of

Portland.  (Reply [158] at 9–10.)  Indeed, on all but one of his claims, Mr. Wimett presents no

evidence that would link any individual Defendant's conduct to official City policy.  Because

Mr. Wimett's submissions contain materials that bear on whether City policy sanctioned Officer

Sothern's unconstitutionally excessive use of a TASER, I discuss that claim in detail below.

## A.    *Final Policymaking Authority*

     The Charter of the City of Portland grants the Chief of Police the authority to "issue such

administrative rules and regulations . . . as are necessary to govern the conduct of the members of

the Bureau of Police."  Charter of the City of Portland, § 3.20.160.[9]  The Chief propounds these

rules and regulations at least in part in the form of "directives," many of which are published in

---

[9] The Charter is available online at http://www.portlandonline.com/auditor/index.cfm?c=28411&a=14680 (last visited Aug. 8, 2014).

the Portland Police Bureau's Manual of Policy and Procedure ("Manual").[10]  *See* Manual at 4–5

(new directives must be approved by the Chief).  Municipal law therefore provides that the Chief

is the final policymaking authority with regard to the rules governing police officer conduct.

In the exhibits filed with his response to Defendants' summary judgment motion, Mr.

Wimett included an excerpt from the Manual containing directives governing officers' TASER

use.  (*See* Wimett Decl. [155-1] Ex. 13 at 2–6, ECF pp.44–48.)  These directives provide that a

supervisor must prepare an After Action Report when an officer cycles a TASER more than

three times during a single deployment.  Manual at 556.  Within the report, the supervisor must

state a recommendation as to whether the TASER use was consistent with Bureau policy.  *Id.*

Someone called an "RU Manager" then "review[s] the Taser deployment and make[s] a

recommendation to the [officer's] Branch chief on whether the use was within policy or not

within policy."  *Id.* at 556–57.  The directives require the "Training manager" to do the same.  *Id.*

at 557.  Finally, the "Branch Chief" reviews the RU manager's and Training manger's findings.

*Id.*  "If the Branch chief determines that the use of the Taser was within policy, no further review

will be conducted."  *Id.*  In other words, the Chief-approved directives grant the Branch chief the

final authority to determine that an officer's TASER use was acceptable under the circumstances.

The Branch chief therefore has been delegated final policymaking authority with respect to that

determination.

Confusingly, the officer holding the position of Branch chief appears not to be called a

"Branch Chief," but an "Assistant Chief."  The Portland Police Bureau has three branches: the

Operations Branch, the Investigations Branch, and the Services Branch.  Portland Police Bureau,

*Organizational Chart*, http://www.portlandoregon.gov/police/article/250329 (last visited August

7, 2014).  Each branch is headed by an Assistant Chief; for example, Assistant Chief Larry

---

[10] The 2009 edition of the Manual is available online at http://www.portlandoregon.gov/police/article/32482.

O'Dea is presently in charge of the Operations Branch.  Portland Police Bureau, *Assistant Chiefs and Branches*, http://www.portlandoregon.gov/police/article/492465 (last visited August 7, 2014).  As a "Branch chief" mentioned in the Manual, then, each Assistant Chief is a final policymaking authority with regard to whether his or her officers' TASER use was within Bureau policy.

      **B.**    ***Ratification***

      As noted above, a final policymaking authority cannot ratify a subordinate's conduct unless he knows what the subordinate did and why he did it.  *Christie*, 176 F.3d at 1239; *see also Gattis v. Brice*, 136 F.3d 724, 726–27 (holding that the authorized policymaker of a municipal fire department did not expose the municipality to liability in approving the recommendations of three deputy chiefs absent knowledge of an unconstitutional motivation).  Here, Sergeant Friedman submitted an After Action Report concerning Officer Sothern's use of the TASER against Mr. Wimett on August 23, 2010.  (Wimett Decl. [155-1] Ex. 14 at 1–3, ECF pp.49–51.)  A "Training Captain" endorsed Officer Sothern's conduct as within policy on September 21, 2010.  *Id.* at 1, 3, ECF pp.49, 51.  Finally, Assistant Chief O'Dea initialed the report a week later.[11]  *Id.* at 1, ECF p.49.  The Assistant Chief therefore ratified Officer Sothern's conduct, but only as that conduct is described in the report.  If a reasonable juror could not find excessive Officer Sothern's use of the TASER under the circumstances as Sergeant Friedman described them, then Assistant Chief O'Dea's ratification does not expose the City of Portland to liability.

      Sergeant Friedman's account mirrors Officer Sothern's police report in most respects.  During the struggle that ensued after Officer Sothern removed Mr. Wimett from his bicycle, Mr. Wimett "attempted to bite Officer Sothern on the right forearm."  *Id.* at 1–2, ECF pp.49–50.

---

[11] The initials "L. P. O'Dea" appear on a line labeled "Assistant Chief."  (Wimett Decl. [155-1] Ex. 14 at 1, ECF p.49.)

Using "control holds and verbal commands," Officer Sothern secured Mr. Wimett's right arm and rolled him onto his stomach. *Id.* at 2, ECF p.50. When Mr. Wimett continued to resist, Officer Sothern announced that he would use his TASER if Mr. Wimett did not present his left arm. *Id.* "Mr. Wimett refused to comply," and Officer Sothern fired the TASER's probes into Mr. Wimett's "lower back." *Id.* Due to continued refusal to present his left arm, Officer Sothern cycled current through Mr. Wimett's body three times, commanding Mr. Wimett after each cycle to stop resisting. *Id.* Finally, Officer Sothern cycled the TASER a fourth time, set the device on the ground, and secured Mr. Wimett's left arm as current flowed through the probes. *Id.* This account would lead Assistant Chief O'Dea to understand that Mr. Wimett actively resisted throughout his encounter with Officer Sothern, prompting use of the TASER to coerce him to comply. It certainly would not suggest to the Assistant Chief that Mr. Wimett was unconscious during any of the TASER cycles.

Mr. Wimett argues that cycling the TASER four times was unreasonable even if he resisted in the manner Officer Sothern described. He asserts that Officer Sothern could have handcuffed him during the first TASER cycle rather than the fourth, obviating the need for three more. (Resp. [153] at 10.) This argument is superficially attractive. If the fourth cycle so immobilized Mr. Wimett that Officer Sothern was able to secure both arms in handcuffs, then one might infer that the first cycle would have had the same effect. However, Mr. Wimett's argument is possible only with the benefit of knowledge that Officer Sothern could not have possessed when he first cycled the TASER. At that point, according to Sergeant Friedman's account, Mr. Wimett had recently attempted to bite Officer Sothern on the forearm. Officer Sothern therefore faced a recalcitrant and unpredictable suspect who may well have posed a significant danger. Before deploying the TASER, the officer could not have known whether

doing so would achieve compliance, or whether it would cause Mr. Wimett to behave even more erratically.  Two more cycles were justified in order to encourage voluntary submission and attempt to obviate the need for further physical force.  While another officer in the same position might have resorted to handcuffing Mr. Wimett during a TASER cycle earlier than Officer Sothern did, Officer Sothern's decision to forgo the attendant risk until the fourth cycle was not unreasonable.

Based on the circumstances as the After Action Report revealed them to Assistant Chief O'Dea, a reasonable factfinder would have to conclude that Officer Sothern's repeated use of the TASER in response to Mr. Wimett's relentless resistance was not excessive.  Because Officer Sothern's conduct was not a constitutional violation on these facts, Assistant Chief O'Dea did not expose the City of Portland to liability when he ratified that conduct.  I grant summary judgment with respect to *Monell* liability.  Mr. Wimett's excessive force claim will proceed against Officer Sothern alone.

## CONCLUSION

Defendants' Motion for Summary Judgment [96] is DENIED on Mr. Wimett's fifth claim for relief as against Officer Sothern, to the extent it alleges that Officer Sothern's blow to Mr. Wimett's head and use of multiple TASER cycles amounted to excessive force.  In all other respects, the motion is GRANTED.

IT IS SO ORDERED.

DATED this ___13th___ day of August, 2014.


/s/ Michael W. Mosman_____
MICHAEL W. MOSMAN
United States District Judge

30 – OPINION AND ORDER